Thank you. We'll call the next case, December 19, 2050. Dana-Farber Cancer Institute v. Ono Pharmaceutical Co., Ltd. Mr. Waxman. Thank you, Judge Newman, and may it please the court. The question for this court is not whether Drs. Freeman and Wood collaborated with Dr. Honjo or whether they made valuable scientific discoveries. The question here is whether they made significant contributions to the definite and permanent idea of Dr. Honjo's path-breaking methods for treating cancer. That is a question of law, and even accepting all of Judge Saris's findings of fact, the answer is respectfully no. Let me start first with the 474 patent and Dr. Freeman, where I think the court's legal errors seem particularly clear. I think there were three errors. First, Judge Lurie. Mr. Waxman, Judge Lurie, as you can tell, all of these patents related to treating tumors with a PDL antibody, and it's very clear that Dr. Honjo started out working on autoimmune diseases, and it was when Dr. Wood and Dr. Freeman worked together, and they found that PDL ligand was expressed in tumors and inhibited an immune response, and so they clearly worked together on what was claimed. Isn't that correct? So, I don't think I fully agree with you. I think it's important, Judge Lurie, you mean you partially do. Yes, I do. Let me clarify what I mean. Your question goes to the chronology of who did what when, and I think it's important to understand, and I'll refer the court to pages 14 to 16 of the joint appendix, that before the collaboration began, Dr. Honjo and his team in 1999 had discovered the PD-1 receptor on T-cells, had created antibodies against both mouse and human PD-1. Using knockout mice, they proved that this receptor was a negative regulator of immune response, and they had the idea that PD-1 could have therapeutic effects for cancer. Now, everybody agrees that that didn't amount to conception. That was an idea, but that conception occurred only after Dr. Ewi and Dr. Honjo completed their in vivo experiments in the fall of 2000 that allowed them to form the definite and permanent idea of the full scope of the invention. Everything that happened in between, and I'm including both Dr. Freeman and Dr. Wood, but I do hope that the court will focus on each individually. Everything that happened in between explains the biological, helps explain the biological mechanism for why Dr. Honjo was right, but you didn't need to know that biological mechanism, certainly for the 474 patent, which never mentions in the claims PD-L1 or it was the 474 patent is entirely agnostic as to the identity of the ligand or even whether the tumor cell expresses the ligand. Dr. Minato explained at pages 1990, 1994, and 2012 that the conceived invention was conceived to be effective as an immunotherapy for cancer against tumors, regardless of whether the tumors themselves expressed a ligand. As he explained, the ligand itself, anything that activates the receptor, down-regulates immune response. As all agree, there are many, many cells in the body, including immune cells, as Dr. Minato explained, that express PD-L1 or perhaps some other ligand. The presence of that, whether it's coming from the tumor or not, if blocked, will be an effective, could be an effective therapy against tumors, whether the tumors express PD-L1, PD-L2, or any other ligand. So, Mr. Waxman, are you suggesting, and I didn't see this really pursued in your briefs, with the emphasis on 474, which is throughout, that some of these patents are all divisionals, should be treated differently as far as inventorship is concerned? Yes, Judge Newman, I think your case law is, whether they were divisionals or not, the 474 is a divisional. I believe they're all divisionals following the 048 patent, but I think the court's case law is clear that joint inventorship is determined on a patent-by-patent basis, and indeed, in some respects, on a claim-by-claim basis, insofar as we're talking about dependent claims. Yes, you have a divisional here. A divisional cannot have, I don't believe a divisional can have different inventorship from a parent because a divisional claims material that was disclosed and originally claimed in the parent. So, I don't think that's, I don't think that that's correct, and I don't think that could be correct, Judge Lurie, with all due respect. Inventorship is clearly determined, I mean, you said it over and over again, on a patent-by-patent basis. There is no question, divisionals or not, continuations or not, that all of the five HANJO patents employ the same specification, the same background of invention. What's different is the claim, but it is the claim that determines the invention, and it has to be against the invention that joint inventorship is determined. It cannot be, and for reasons that we stated in our brief and that I can explicate here, even leaving aside Dr. Freeman and the 474 patent, we don't think that either Dr. Freeman or Dr. Wood qualify as having made a significant contribution to the definite and permanent idea of any of the inventions that are claimed in the different patents, but it cannot be that because you make a determination, for example, that Dr. Wood should be considered a joint inventor on the 179 patent, that therefore, because that patent shares a specification with the 474, that he would ipso facto be a joint inventor on the 474. The divisional claims what was described in the parent, so I don't see how a divisional can have different inventorship from what is described in the parent. The divisional obtains its entitlement to a filing date on the basis of the parent, but move on, go ahead. Well, I think, again, I do want to talk about all the patents, but before I leave the issue of Dr. Freeman and the 474 patent, the 474 patent claims blocking PD-1, not PD-L1 or any other ligand, blocking PD-1 to treat cancer, it directly follows from Dr. Honjo's pre-collaboration discovery that blocking this receptor enhances the immune response. It's a treatment with an anti-PD-1 monoclonal antibody. Does that not come from the ligand? It doesn't. The PD-1 monoclonal antibody does not depend on the ligand. The antibody was created by Dr. Honjo and Dr. Minato before the collaboration ever began. When the collaboration began, they sent that antibody and their discoveries that were soon to be published in the Immunity Journal, which discovered that blocking the antibody had the effect of avoiding suppression of the immune response to Dr. Wood. Dr. Wood took that anti-PD-1 antibody, and after Dr. Wood concluded that the 292 sequence was in fact a ligand and bound to PD-1, he used the PD-1 antibody and confirmed to Dr. Honjo what Dr. Honjo had discovered and disclosed in his article in Immunity. The point is, if you look at the asserted contributions of Dr. Freeman, the district court found that Dr. Freeman located the 292 molecule in a public database, but it was Dr. Wood who discovered that 292 was a ligand for PD-1, and it was Dr. Wood who confirmed using Dr. Honjo's antibody that the ligand in fact activated the receptor and down-regulated the immune response. Mr. Waxman, this is Judge Stoll. Good morning. I have one question for you, and this is specifically with regard to your argument about the 474 patent and that it doesn't talk about PD-L1. But didn't, this is my question, the district court judge found that all three, Dr. Wood, Dr. Freeman, and Dr. Honjo, were all having a simultaneous focus on this pathway and cancer and using this pathway to 91. And so why doesn't that defeat your argument, even if the claims in the 474 patents are not talking about anti-PD-L1 antibodies? Yes, thank you, Judge Stoll. I have three points I'd like to make in response. First of all, what Judge Saris was correctly identifying was the collaboration. And of course, collaboration is a necessary but not sufficient condition for inventorship. Number two, as Judge Saris found, Dr. Freeman and Dr. Wood did not establish by clear and convincing evidence that they were the ones who conceived of the idea of treating cancer by means of blocking the PD-L1 receptor. She found on page 15 of her opinion that prior to this collaboration ever beginning, once they conducted their knockout mouse experiments, Dr. Minato and Dr. Honjo specifically discussed the potential for that discovery to provide a possible immunotherapeutic response to cancer. And finally, the point here is that what we're talking about here, adjusting immune response, is utterly idiosyncratic. There are dozens of receptors on a T cell. There are hundreds of cells and structures in the body's immune system. No one can predict how they will all work in response even to a foreign pathogen like the COVID-19 virus, much less to a complex of cells like a tumor that are produced by one's own body. And that's why knowing the specific chemistry of a particular pathway does not amount to a significant contribution to conception. I think it's highly revelatory. If you look, for example, Judge Stahl, at the provisional patent application that Dr. Freeman and Dr. Wood filed in November of 1999, for which they ultimately received three patents on this pathway, they disclosed that the 292 sequence had been found in a tumor cell. Can I ask a question about that, actually? Yes. I'm glad you brought that up. So, just so I understand, I mean, one of the arguments you make, and I'm moving off to a different argument a little bit, but one of the arguments you make is that some of the patents that Dr. Freeman and Dr. Wood were actually in the prior art at the time of conception. You're not relying on that provisional patent application to support that contention, are you? Because as I understand it, that would not have been published before conception. That's right. We're relying on... I was about to make a point on that provisional, a different point, which had to do with the unpredictability of how you use the knowledge about this pathway in order to provide... I understand, but... Okay. I understand. That's in your brief, but what about the question? I'm sorry. Our prior art point turns on, number one, the publication by Dr. Chen, who was the first person to identify the PDL1 ligand nine months before conception, and then the publication by Dr. Honjo, Dr. Wood, and Dr. Freeman of the article that was published, I believe, on October 1st, 2000. Dr. Honjo, in his Nobel lecture, seemed to give quite a bit of credit to Drs. Freeman and Wood. Dr. Honjo's remarks in the Nobel lecture are public record, and he acknowledged that they were valuable collaborators, and there's no doubt, Judge Lurie, that they were. That's just not the test for joint... It is a condition of joint inventorship, but it's not sufficient. Let me interrupt to go back to this prior art question that Judge Stoll asked. I thought you were relying on the filing date of their separate initial filing as to what they had discovered, because a patent application is deemed a reference as of its filing date, not as of its issue date. Yes, and so our point there, Judge... But you said no to Judge Stoll's question. Maybe I'm confusing myself. The disclosures in the provisional application, as I understand it, were not public as of the date of conception. They weren't public, but they technically are prior art. They are technically prior art, but what those disclosures and more were published by Drs. Wood, Freeman, and Honjo in an article that was available to everybody prior to the date of conception. Now, Judge Stoll, I heard you... Well, that doesn't really say that they can't have been joint inventors, that collaborators decide... I'm just using the word collaborator in a sense that you're using it, if they decide to publish their findings as well as proceed through the patent system. So I do think... This is our proposition, and I think it's correct as a matter of first principles. The key to inventorship is the mental act of conception. Even if you provided earlier assistance to what ultimately became a conceived invention, if you choose to put those disclosures into the public domain before conception, they become free for all to use because prior art is not an aspect of invention. Does your position depend on agreeing with that proposition? You really keep everything out of publication until a patent application is filed despite grace periods and all sorts of generally accepted law. So, Judge Newman, first of all, this is one of three independent arguments that we're making as to why, with respect, we think the district court erred. But as to this point, I'm not making a point at all about the statutory one-year grace period or any other grace period for prior art disclosures before the filing of a patent application. This has to do with conception, which in this case occurred on October 27, 2000. The patent applications here weren't filed until 2003. And so the public disclosure in this case occurred well beyond outside the one-year grace period. The fundamental point... We're talking about conception of a claim, which has several aspects to it. The fact that one of those aspects may have been prior published does not defeat conception of the totality of what is ultimately claimed. I totally agree with you, Judge Lurie. And as a thought experiment, imagine that you have an invention to the combination of A, B, and C. You might disclose A to somebody else in confidence, and that person might be thinking about A while looking for B and C. But when that person figures out B and C and the time comes to put it all together, that is to conceive the combination of A, B, and C, you can't claim credit for A if it's in the public domain. But if all of these people work together on A, B, and C, the fact that A was published earlier by one of the inventors doesn't defeat a conclusion that these people together worked on A, B, and C. Well, I guess what I would say, Judge Lurie, with respect is, let's just take a case of a sole inventor. If the conception was the combination of A and B, and A, B, and C were all essential components, if the inventor prior to conception had put A in the public domain, he broke the chain by publishing A before the mental act occurred, at which point the contribution of A looks just like any other prior art. So, Mr. Wexler, let's assume that the statement of the law, as Judge Lurie has mentioned it, it certainly matches what I've always thought the law is. So it would be helpful, I think, to take a couple of more minutes. I know we're running over to explain the other reasons. It seems to me that there is a strong argument that this could be used as a method for treating and curing cancer. I was struck by the fact that in the publication, the 1999 publication of Drs. Wood and Freeman, that they didn't say that. They suggested alternative future uses. And it does seem to me that the strong argument is the same one that it struck me. The culture in awarding a Nobel Prize is that in your speech to the King of Sweden, you give credit to everybody who had anything to do with getting you to where you are, and that Dr. Hanjo, however, we've got some very strong claims and we've got very strong contributions. Where does the line get drawn? So I think that this court's case law has recognized a distinction between but-for causation, including contributions, as this court said in Lilly, that help realize an invention, on the one hand, and on the other hand, the test for joint inventorship, which is significant contributions to the definite and permanent conception of an operative invention in all of its aspects. And Your Honor's reference to the November 1999 provisional, I think, is a good illustration of just how far the discovery of a particular molecular pathway is from the mental conception of something that had never even been thought to be true. That is, that the immune system of a complex organism could be used to treat cancer. In their November 1999 patent provisional application, they disclosed PD-L1, they disclosed its identity as a ligand, they disclosed their research on the pathway, they disclosed the concept that antibodies can block interaction. But in terms, and they posited that this discovery of this pathway could be an effective means of treating, and then they identified a whole number of classes of cancers. But one of the embodiments that they proposed of this invention was to elevate PD-1 levels in order to upregulate the immune response, which is, as I think Your Honor's question was suggesting, the exact opposite and incorrect speculation of the, in fact, the efficacious method of doing this. And we have the fact that the patent app, that Honjo's patents were granted over all of these disclosures, which are also referenced in the background of the invention portion of the application. And we cited the court to the decision of the British Patent Court in Merck versus Bristol-Myers Squibb, which involved a challenge by Merck, which had developed a competing checkpoint PD-1 inhibitor. And what the British Patent Court said on the very last page of its summary and conclusion, I don't believe I have a public citation for it, and I'm quoting, and this is talking about the earlier Dana-Farber-Wood-Freeman application. The court said, quote, while its disclosure may be enough to support the general idea of using an agent which acts somehow on the PD-1 pathway in medicine, it does not make plausible the specific idea of an anti-PD-1 agent to treat cancer. A skilled person who conducted a test of PD-1 blockade against a tumor in a mouse would not have a fair expectation of success. And that's, again, just the demonstration of the leap between making or Hangzhou and Dr. Minato and EY had made that blocking the PD-1 receptor would up-regulate immune response to the conceived invention that all agree had to, could only have been done after Dr. EY's in vivo experimentation using real organisms that, in fact, down-regulate blocking PD-1 was both a safe and effective way of treating cancer. Okay, let's hear any more questions from Mr. Waxman at the moment. We'll save us a little time. Thank you, Your Honor. Okay, let's hear from the other side. Mr. Weyer. Thank you. Are we unmuted? Yes. I hear you. I hear you. Thank you very much, Judge Newman, and may it please the Court. As this Court heard in this appeal, appellants do not challenge as clearly erroneous one single finding of fact in Judge Sarris' 111-page decision. The Court could summarily affirm on that ground alone. Well, the real question is the conclusion that she drew and not the facts that she found. Isn't that right? And what, yes, but what's important here is what we're debating about is the significance of the contributions. And the argument that the appellants are making is that this is a question of law, that the Court committed reversible error. It's a question of law, the significance of the contributions, not the ultimate conclusion, but the factual, the subsidiary factual question they say is a question of law. And in case after case, this Court has said that while the ultimate determination of inventorship is a question of law, it is premised on underlying questions of fact, such as the existence of collaboration, communication of the contributions, and the significance of the contributions to conception. This principle was articulated first in the Hess case in 1997. The issue in that case was whether- No, we understand that. But let's say that these scientists were not collaborators, but that Dr. Hondure just read their scientific paper and thought that, and it gave him some more ideas, or the ultimate idea that he then through their tests on the knockout mice and so on, confirmed. Would your answer be the same, that you pick up an idea from the published literature, because scientists read the literature all the time, that's their stock and trade? Yeah, and absolutely not. Your Honor is absolutely correct. So there are several factors that enter into the ultimate legal conclusion, several factual questions, one of which is, were they collaborating? Were they working towards the same end? That's part of the proof. That's part of the burden of proof. And of course, in this case, Judge Sarris found that there was lots and lots of evidence of collaboration. So that's not an issue in our case. No one said they weren't collaborating. The line that we're being asked to draw is the line between collaboration and conception. Is that right? No, I think collaboration is a separate issue, wasn't appealed. The issue is the significance of the contributions, whether they made significant contributions along the way to conception, not whether they were there at the final moment of the final experiment performed, but rather, did they make contributions that were significant along the way to conception? Mr. Ware, Mr. Waxman has focused first on the 474 patent, which claims treatment of a tumor with an anti-PD-1 monoclonal antibody. Did Dr. Wood and Dr. Friedman contribute to that? Absolutely, Your Honor, and thank you for asking that. Let me say first that the appellants say that, well, these patents don't claim PD-L1, they don't claim the pathway, but nor do they claim as a separate patent, as a separate claim, they don't claim PD-1 or PD-1 antibodies, which has been known in the art for years. What they are claiming is a method of treating cancer by blocking PD-1, and when their expert opined, he was asked, excuse me, what was the dimension of the full invention, and he said it was a method of treating cancer by blocking the PD-L1 pathway, and he said that with reference specifically to the 474 claims. Now, Judge Saris made specific findings of fact that bear on this. She found that Dr. Honjo's conception of administering either PD-1 or PD-L1 antibodies both required knowledge of PD-L1's molecular structure and inhibitory function. The point being that you can't treat cancer, and you can't claim a method of treating cancer by administering a PD-1 antibody to prevent a tumor from using the pathway to inhibit the immune response without knowing if the antibody will block PD-1's interaction with PD-L1. It's not just a question of whether the antibody will bind to PD-1, it's will it block the interaction with PD-L1, and this is, you see this throughout the patent. What the patent describes as the invention is stopping the interaction between PD-1 and PD-L1, and you can't have a claim to that, and you don't have 112 support for that if you don't know what PD-L1 is, if you don't know its identity and its molecular structure. I think it's notable also that in the patent itself that the examples that were provided as the 112 support, examples one through five, all use PD-L1 antibodies. There is no example in the priority document, that is the 2002 filing, there is no example of using a PD-1 antibody, and what Dr. Honjo did and the inventors, they extrapolated from the fact that blocking the PD-L1 pathway with a PD-L1 antibody would also work by blocking it with a PD-1 antibody. There was nothing special about PD-1, and in fact the mouse experiments that they make so much of, the in vivo mouse experiments, um, simply tested the growth of an implanted tumor with and without PD-L1 in the tumor. You say simply? That was the verification of the entire concept, was it not? I mean, you say that they could have proceeded without the mouse experiment? Oh, I'm not, that isn't my point, your honor. My point is simply to say that those experiments didn't use a PD-1 antibody. Again, the conception was not based upon testing a PD-1 antibody. The conception was to determine in that case, finally to determine in a mouse model, in an in vivo model, that blocking the pathway affected the growth of the tumor, and it didn't matter whether you blocked the pathway ultimately with a PD-1 antibody or a PD-1 antibody. I also want to mention that Judge Saris made a finding of fact at A94 that the mouse tumor model experiments only triggered conception because Dr. Honcho knew from Dr. Freeman's work that like the transfected tumors in the mouse experiments, human tumors express PD-L1. She said this in a discussion of the 899, which is directed to that patent, likewise does not expressly refer to expression of PD-L1 on tumor cells, but the conception in this case was based upon knowing that the tumors, that human tumors expressed PD-L1, which came from Dr. Freeman. Dr. Monado himself, who was a named inventor, admitted that unless human tumors naturally expressed PD-L1, all of their mouse studies would mean nothing. That's a quote from his testimony. Since we're on the 474, I'd just like to take one minute to make a comment on the dependent claims, which are directed to specific kinds of tumors. The appellants argue that even assuming that Dr. Honcho learned only from Dr. Freeman that the claimed tumors in the dependent claims highly expressed PD-L1, that Dr. Freeman's contribution to a sole limitation in a dependent claim cannot count for inventorship. They are wrong on this. This court expressly held in Eli Lilly versus Paradigm that if the putative inventor conceived the single limitation added in dependent claim six of that patent and communicated this conception to the patent owner, then he would be a co-owner. I'm sorry, a co-inventor. But you're not saying that Drs. Wood and Freeman suggested to Dr. Honcho, maybe this could be useful to cure cancer? Oh, yes. Judge Sarris made extensive findings to that effect. That is to say, she said... No, she didn't. She cited their publication. No, no, no, no. Specific meetings. There were three collaboration meetings in 2000, and she said during those meetings that they were working together and discussing the harnessing of the PD-L1 pathway to treat cancer. Yes, it's clear that these scientists didn't hold back in talking with each other what they were doing and trying to advance the science in this important direction, but she didn't say that until Dr. Honcho came along, there was no thought of this pathway to cure cancer. In fact, I think there's emphasis in the briefs that in a separate earlier patent application that Drs. Freeman and Wood suggested alternative paths, that including the one that Dr. Honcho came up with and demonstrated, but that they hadn't taken the next step of focusing on and testing, shall we say, reducing to practice the particular path in the 474. Is that fair? It's not, Your Honor, and let me refer you, let me just give you a site. In Appendix 31 to 32, Judge Sarris actually addressed what was in the provisional application, and what you heard from Mr. Waxman was an argument that they made several times at trial, and it was thoroughly debunked at trial by expert testimony, and Judge Sarris did not accept it, and what she said about that application is that it claimed methods of modulating the immune response by blocking the PD-1 pathway, PD-L1 pathway. The patent explained that the PD-L1, PD-1, PD-L1 interaction inhibits an immune response, and it included a claim, and this is claim 22, in which PD-1 signaling is inhibited by an antibody in order to upregulate the immune response to a tumor. So these ideas were in that patent application. What was not in that patent application, contrary to Mr. Waxman's statement, is that it did not talk about expression of PD-L1 in tumor cells, and that work came later, and that's one of the reasons why you would issue the ultimate patents over that provisional application. It was important work, but nobody suggests that the work was done at that point, and the work continued. Where was there experiments treating tumors actually seeing if it worked? The provisional application did not have experiments treating tumors. I hasten to add also that the in vivo mouse experiments in the fall of 2000 also did not treat a tumor and did not use antibodies. The in vivo mouse experiments were an important contribution. We don't disagree with that at all. And that's a joint inventor, a named inventor? Yes. All right. The scientist who performed those experiments? Yes, Dr. Ewie. But that too, was removed from the actual claims because it did not treat a tumor. It was actually, as their expert agreed, it was just showing that the pathway is inhibitory. That had been shown in vitro. I'm sorry. What did you say? The experiment was removed from the claim? What do you mean by that? What I mean is simply that the experiment was an experiment to show that the pathway was inhibitory. It showed that the pathway was inhibitory in an animal model, but it did not treat a tumor. It did not use an antibody, and of course it was in mice. So we agree it was an important contribution, but it was one of many important contributions that ultimately led to the conception. I don't have time, I don't think, to really get into the prior art argument, but I just would like to say that the principle that this court has long applied concerns whether a putative inventor has done nothing more than explain the current state of the art. That is, when the contribution is made. Thus, in the cardiac case, the court said we can't identify any case in which we barred co-inventorship as a matter of law just because the contribution later appeared in the public domain when the ideas were not contemporaneously available. In fact, the principle that is being argued by the appellants would require this panel to overrule this court's decision in Pannu v. Eyelott Lab, which has been good law since 1998. In that case, Dr. Pannu had placed his contribution in the prior art more than a year before he even met Dr. Lincoln and began collaborating. This court held that Pannu was still an inventor because he contributed his ideas to a total inventive concept as part of a collaborative enterprise. So, if the publication of the contribution more than a year before the collaboration starts does not preclude inventorship, then certainly there can be no bright line rule precluding inventorship where the publication is nearly a year after the parties began collaboration. Indeed, the publication they are referring to now was only three weeks before conception, but the contributions had already been used by Dr. Honjo and used to develop his further experiments. I think my time's up. I'm happy to go on. But the totality of the claims was not in the prior art. Maybe one piece of it. I'm sorry. Is your honor referring to the Pannu case? No, no, this case. The totality of what's claimed was not in the prior art. Oh, no, not at all. Not at all. Mr. Waxman is saying if a portion of it is, then that cannot be used to show co-inventorship of the totality of the claims by the authors, including the author of the disclosed portions. No, that's wrong. And in this case, just to emphasize this, all of the tumor expression data that Dr. Freeman contributed at the collaboration meeting in September 2008, just weeks before the alleged conception date, that work was not even published until 2003. And the significance of the PD-L1 expression in tumors runs throughout the patent. It is the key to why the inventors in the patent say that you can treat cancer by blocking the PD-1, PD-L1 pathway, because of the fact that human tumors express PD-L1. And that's why all of their invention would work with tumors that express PD-L1. Thank you. Okay. Thank you. Any more questions for Mr. Ware? No. No. Okay. Thank you, Mr. Waxman. You have three minutes. Thank you, Your Honor. Judge Lurie, with respect to your question about divisionals and whether somebody who's a named inventor on one patent must be a named inventor on the other, I just want to point the court to 7 CFR section 1.53, which says that a continuation or divisional application that names as inventors the same or fewer than all of the inventors named in the prior application may be filed under this paragraph. The inventorship in the application. I'll just respond briefly to Mr. Ware's point about the 474 patent and his assertion that conception of the 474 patent depended on PD-L1, and then a point about Panu and his prior point. It is wrong as a conclusion of law that conception of the 474 patent depended on PD-L1. And in any event, even if it were right, that would not help Dr. Freeman. It was Dr. Wood, not Dr. Freeman, who discovered that 292 was, in fact, a ligand for PD-1. And it was Dr. Wood, not Dr. Freeman, who determined that the ligand's interaction with the receptor would downregulate immune response, confirming something that Dr. Honjo had already discovered and published. The point about antibodies and the fact that Mr. Ware was pointing out the fact that in vivo experiments didn't even use antibodies just underscores the point that you don't need antibodies for conception. They use the knockout mouse. The use of antibodies to block receptors was well known in the art, and Judge Sarris correctly concluded that the development of particular antibodies and all of the antibodies in the specification were developed by Honjo and reduction to practice. Wood and Freeman, in their November 1999 provisional, made reference to the fact that asserted that antibodies blocking this pathway would affect the immune response. They didn't have any antibodies at the time other than the PD-1 antibody that Dr. Honjo had provided them. On this question about prior art, we have explained why we think Panu doesn't stand in the way of what we think is a first principles point. Judge Lurie, I know you authored that opinion, and it probably doesn't do me any good to explain what it means. I see my time has expired. Let me just proceed with this issue. We do think that this issue was actually directly confronted in the Matute case, which we cite. I recognize that it's an unpublished decision, and maybe this is an appropriate case to really clarify this court's case law. The point here that Mr. Ware was making, which is, well, in the October 1 article, it's not true with respect to the results of the staining experiments that Dr. Dorfman did, which showed that PD-L1 was expressed on a number of different tumors and many, many different healthy cells. Judge, at page 103 of her opinion, Judge Sarris correctly concluded that the identification of specific tumors or healthy cells expressing PD-L1 was not a significant contribution to the 474 patent. Any more questions for Mr. Waxman? No. Thank you for a well-argued case. Thank you, Your Honor. Thank you all. The case is taken under submission. Thank you. That concludes this panel's argued cases for this session. The Honorable Court is adjourned until Monday morning at 10 a.m.